UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
FIREFLY AIR SOLUTIONS, LLC, D/B/A 128
CAFÉ, ON BEHALF OF ITSELF AND
ALL OTHERS SIMILARLY SITUATED,

                              PLAINTIFF

     v.

AMERICAN EXPRESS COMPANY AND
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

                              DEFENDANTS.
----------------------------------------------------------------x

File No. CV10-5200

CLASS ACTION
COMPLAINT

HURLEY, J.
LINDSAY, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ NOV 10 2010 ★
BROOKLYN OFFICE

Plaintiff Firefly Air Solutions, LLC, doing business as 128 Café ("Plaintiff"), on behalf of itself and all others similarly situated, as and for its Complaint against Defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express" or "Amex"), hereby allege as follows:

## I.
## INTRODUCTION

1. This action challenges Amex's rules preventing U.S. merchants from providing consumers with incentives to use forms of payment that are less expensive to the merchant than Amex-branded payment cards (the "Anti-Steering Rules"). In the absence of the Anti-Steering Rules, consumers would have incentives to use payment forms — such as debit cards, cash, checks, Visa-, MasterCard- and Discover-branded payment cards — that impose lower costs upon the merchant than do Amex-branded payment cards. If merchants were free to give consumers incentives to use less costly payment products, then Amex would be under pressure to reduce its merchant pricing or lose consumers to cheaper payment forms. The Anti-Steering Rules, however, insulate

90411

Amex from any such price-based competition. By ensuring that the consumer neither knows nor cares how expensive her payment product is to the merchant, and thus has no incentive to switch to an alternative payment form, or to a competitor of Amex, the Anti-Steering Rules serve to entrench Amex's position of monopoly power in the U.S. markets for corporate, small business, and personal charge card services, among other markets.

2. The Anti-Steering Rules further ensure that certain merchants seeking to pass along the high merchant discount fees they incur on Amex payment card services must raise their prices to all consumers, including cash-payers, debit card users, and those who would otherwise seek to avoid the high cost of such services. In the absence of the Anti-Steering Rules, the merchant would be free — for example — to impose the merchant discount fee directly upon the Cardholder who chooses to use the more expensive Amex-branded payment card. The price of goods and services would fall because those prices would no longer be marked up to reflect artificially inflated merchant discount fees.

3. In addition to insulating Amex from competition and raising prices for all consumers, the Anti-Steering Rules compel inequitable and anticompetitive subsidies, running from the least affluent U.S. consumers to the most affluent. Because merchants must mark up the price of all goods to cover the costs of accepting Amex-branded payment products — rather than impose the discount fee directly upon Amex Cardmembers or otherwise steer the Cardmember to a cheaper payment form — the Anti-Steering Rules effectively compel cash payers and users of other low cost payment forms to subsidize all of the costly perquisites enjoyed by Cardmembers using Amex-branded payment card products, including frequent flier miles, rental car insurance, free gifts and even cash-back rewards.

2

4. Finally, as discussed below, the Anti-Steering Rules simply have no pro-competitive benefits to offset all of their patent and significant anticompetitive effects.

## II.
## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that, pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because the Defendants may be found or transact business within this District.

## III.
## THE PARTIES

7. Plaintiff Firefly Air Solutions, LLC is a corporation organized under the laws of the State of Minnesota, with its principal place of business in St. Paul, Minnesota. Plaintiff Firefly Air Solutions, LLC owns and operates 128 Café, where it began accepting Amex cards in or about November 2007, and continues to accept such cards to this day.

8. Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

9. Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company. American Express Travel

Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network. Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

## IV.
## CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act, and for money damages.

11. The class is comprised of all merchants that have accepted Amex-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class"). The Class does not include Amex or its agents, subsidiaries or affiliates.

12. The members of the Class are so numerous that joinder of all members is impracticable.

13. Questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

14. The claims of the Plaintiff are typical of the claims of the Class.

15. Plaintiff and its counsel will fairly and adequately represent the interests of the Class. Plaintiff has retained counsel who is competent and experienced in federal antitrust and class action litigation.

16. Amex has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

17. This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no extraordinary difficulty in the management of this class action.

## V.
## FACTUAL BACKGROUND

### Industry Background

18. When a consumer presents an Amex-branded payment card to a retailer for payment, the merchant swipes the card and transmits a record of the transaction to Amex. Amex then sends to the retailer's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that Amex charges retailers. For a typical retailer in the travel and entertainment industry, for example, that discount fee is well over 3% of the total transaction. At 3%, if a Cardmember presents an Amex-branded payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its Cardmember for $100.

19. Other payment products are far less costly to the merchant. Debit cards, Discover-branded credit cards, and even most Visa- and MasterCard-branded payment cards carry much lower discount fees than Amex. And of course, cash and checks are likewise far less costly to the merchant. As a result, if merchants were able to steer transactions to payment forms other than Amex, they would realize significant savings. In a competitive retail marketplace, those savings will be passed along to all consumers in the form of lower prices for all.

**The Anti-Steering Rules**

20.   There are many ways that a retailer might steer transactions to a less costly and more efficient payment card, including:

- offering a discount for using a cheaper form of payment, such as Discover-, Visa-, and MasterCard-branded credit cards, debit cards, checks or cash;

- verbally asking customers if they mind using the cheaper payment form;

- posting signage indicating a preference for the cheaper payment form;

- posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

- imposing a small surcharge for using Amex-branded payment cards (provided the retailer is located in one of the 41 states and the District of Columbia where such surcharges are legal); and

- taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

21.   Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in any of these efficiency-enhancing practices.

22.   The Anti-Steering Rules are set forth in Amex's standard form Card Acceptance Agreement and are available on the "Merchants" section of Amex's website. A typical iteration of the Terms And Conditions For American Express® Card Acceptance Agreement, drawn from Amex's website on January 30, 2007, provides:

> When a customer asks what payment methods are accepted, you will mention the Card. You will honour the Card, and will not attempt to: (1) dissuade the Cardmember from using the Card; (2) criticize or mischaracterize the Card or any services or programs offered in connection with the Card; (3) persuade the Cardmember to use any other credit, charge, debit or smart card or other card, account access device or service; or (4) impose any restrictions or conditions on the use or acceptance of the Card that are not imposed equally on the use or acceptance of other cards.

6

23. The Card Acceptance Agreement further provides the merchant may not engage in any practices or programs that "indicate or imply that you prefer Other Payment Products;" nor may the merchant "promote the use of any Other Payment Products more actively than you promote the use of the [Amex] Card."

24. The intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price-based competition in the payment card services markets. A competitor network — such as Discover Financial Services or a new market entrant — may offer to provide comparable services to retailers at a fraction of the price charged by Amex. Such a pro-competitive strategy, however, will not allow this would-be competitor to gain any market share from Amex. The reason that the competitor network cannot gain market share by offering the same services at lower prices is because of Amex's Anti-Steering Rules. The Anti-Steering Rules create a vertical restraint that ensures that the consumer will have no incentive to use the less expensive and more efficient payment medium. And it is the consumer who decides which payment option to use. The Anti-Steering Rules thus render Amex largely impervious to price-based competition.

25. In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex is able to charge merchants for processing transactions on the Amex payment card network would be greatly diminished. Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

26. Further, in the 41 states and the District of Columbia where surcharging is permitted, the abolition of the Anti-Steering Rules would enable merchants to impose directly upon the Amex Cardmember the cost of all the frequent flier miles, Membership

Rewards Points®, travel insurance and other perquisites that are financed out of merchant discount fees. Presently, the benefits enjoyed by Amex Cardmembers are subsidized by all consumers, as well as merchants. If the merchant were free to pass along the discount fee *directly* to the Amex card user via a discrete surcharge, the Cardmember could decide for herself if she wants to incur the costs necessary to fund these perks. Customers who choose to use an expensive payment medium would pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved of the obligation to subsidize that particular junket.

**Market Definition and Market Power**

27. The product dimension of the relevant markets at issue in this case are no broader than:

    (a) corporate card services, of all brands;

    (b) small business card services, of all brands; and

    (c) personal charge card services, of all brands.

28. In fact, there exist relevant product markets that consist solely of:

    (a) Amex-branded corporate card services;

    (b) Amex-branded small business card services; and

    (c) Amex-branded personal charge card services.

29. The geographic dimension of each of the above-referenced relevant product markets is the United States.

30. Amex has market power or monopoly power in each of the relevant product markets referenced above.

31. In the alternative, even if the relevant market were regarded as being comprised of all general purpose charge and credit card services (which would be erroneous), Amex still possesses market power for purposes of the instant claims challenging its Anti-Steering Rules for the reasons set forth in a Report of the Reserve Bank of Australia, issued shortly before Amex's agreement to rescind its no-surcharge rules in Australia:

> By itself, the finding that credit and charge cards issued on the American Express or [other] networks comprise small shares of total cards or support small shares of total card-based transactions does not prove that these systems lack market power in the sense relevant for the analysis of no-surcharge rules. For example, if business travelers using American Express corporate cards were required to use those cards when traveling for business purposes in order to qualify for reimbursement by their employers, then this requirement might generate market power for American Express with respect to merchants, particularly merchants catering to business travelers, such as airlines, hotels, and restaurants. Visa also argues that American Express cardholder rewards programs could have similar effects for other consumers.

**Nature of the Injuries**

32. The Anti-Steering Rules injure merchants because they insulate Amex from price-based network competition, thereby enabling Amex to extract supra-competitive discount fees. The Anti-Steering Rules insulate Amex from competitive pressures in merchant pricing because the Rules are imposed across the board, on all U.S. merchants. For any particular merchant, then, this harm is not inflicted merely by Amex prohibiting that merchant from steering. Instead, the particular merchant is harmed because Amex imposes the Anti-Steering Rules upon each new and existing merchant that joins or participates in the Amex network, and because Amex enforces its Anti-Steering Rules.

33. On a going-forward basis, the Anti-Steering Rules will further inflict new and accumulating injury on U.S. merchants because the similar rules of other networks have either been rescinded or will be rescinded as a result of ongoing litigation and settlements, creating a situation in which Amex's maintenance of Anti-Steering Rules would have profoundly (and qualitatively new) anticompetitive effects upon U.S. merchants. In particular, Discover Financial Services announced in early 2006 that it is rescinding its "no-surcharge rule" and any prohibitions upon merchant steering. And on October 4, 2010, the Department of Justice announced that it filed a civil antitrust lawsuit against Amex, VISA, and MasterCard for this exact anticompetitive action. However, at the same time the DOJ announced that it had settled with VISA and MasterCard whereby, if approved by the court, those two companies would rescind their Anti-Steering Rules. Amex and the DOJ did not reach such an agreement. If merchants are free to provide all customers with incentives to use lower cost payment forms <u>except for Amex Cardmembers</u>, then the nature and scope of the injury inflicted upon merchants by the Anti-Steering Rules will be greatly magnified and altered.

34. Merchants will continue to suffer irreparable injury as a result of the Anti-Steering Rules until three conditions are satisfied:

    (i) The Anti-Steering Rules are abolished;

    (ii) Merchants are fully and fairly informed of the abolition of the Anti-Steering Rules, and of the parameters of permissible surcharging; and

    (iii) Consumers are fully and fairly informed of the nature of, and reasons for, the payment card surcharges they may encounter.

35. In addition, as a direct and foreseeable result of Amex's enforcement of its Anti-Steering Rules, merchants have suffered damages. But for the Anti-Steering Rules,

10

Amex would be compelled to, and would in fact, charge merchants significantly lower discount fees than it presently does. The difference between Defendants' merchant fees and the fees that would apply but for the Anti-Steering Rules represents damages to the merchant Class.

## FIRST CLAIM FOR RELIEF

*For Willful Monopoly Maintenance in  
Violation of Section 2 of the Sherman Act, 15 U.S.C. §2*

36. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

37. Section Two of the Sherman Act prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

38. Amex has and exercises monopoly power in the payment card services markets set forth above.

39. The Anti-Steering Rules further and protect Amex's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

40. The Anti-Steering Rules harm the competitive process, harm consumers, and are not supported by any procompetitive justification.

41. Amex's willful maintenance of monopoly power by the anticompetitive device of the Anti-Steering Rules constitutes a violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

42. As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the

Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

43.    As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

*For Imposition of Unreasonable Restraints of Trade
in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1*

44.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

45.    Section One of the Sherman Act prohibits contracts in restraint of trade. More specifically, it prohibits a defendant from exercising market power to impose anticompetitive vertical restraints.

46.    Amex has and exercises market power in the relevant markets identified above.

47.    The Anti-Steering Rules, imposed upon merchant Plaintiff by Amex, represent an unlawful contract in restraint of trade. Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for payment card services.

48.    The Anti-Steering Rules are anticompetitive. Among the anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the entrenchment of Amex's market position and

the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

49. There exists no procompetitive justification for the Anti-Steering Rules.

50. As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

51. As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully seeks an Order:

A. Directing that the instant action may be maintained as a Class Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(2);

B. Declaring that the Amex Anti-Steering Rules are illegal and directing their rescission;

C. Directing Defendants to cooperate with Plaintiff in the establishment, funding and execution of a campaign that adequately informs merchants and consumers of the rescission of the Anti-Steering Rules;

D. Awarding damages in an amount to be determined at trial and then trebled;

E. Awarding attorneys' fees and costs of suit; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues so triable.

Dated: 11/9/10

                                              **MEREDITH COHEN GREENFOGEL**
                                              **& SKIRNICK, P.C.**

                                              */s/ Robert A. Skirnick*

                                              Robert A. Skirnick (RS 2636)
                                              **MEREDITH COHEN GREENFOGEL**
                                              **& SKIRNICK, P.C.**
                                              19 Rockwood Road West
                                              Manhasset, NY 11030
                                              Tel:    (917) 599-7200
                                              Fax:   (516) 365-7337
                                              MCGSNY@aol.com

                                              Steven J. Greenfogel
                                              Joel Meredith
                                              Dan Allanoff
                                              **MEREDITH COHEN GREENFOGEL**
                                              **& SKIRNICK, P.C.**
                                              1521 Locust Street, 8th Floor
                                              Philadelphia, PA 19102
                                              Tel:    (215) 268-7641
                                              Fax:   (215) 569-0958
                                              sgreenfogel@mcgslaw.com
                                              jmeredith@mcgslaw.com
                                              dallanoff@mcgslaw.com

                                              Vincent J. Esades
                                              **HEINS MILLS & OLSON, P.L.C.**
                                              310 Clifton Avenue
                                              Minneapolis, MN 55403
                                              Tel:    (612) 338-4605
                                              Fax:   (612) 338-4692
                                              VEsades@heinsmills.com

                                              *Counsel for Plaintiff*